IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

_____
                                )
UNITED STATES OF AMERICA,        )
                                 )
                                 )   DOCKET NO. 3:20-CR-385
        vs.                      )
                                 )
KENNETH JEROME WATKINS,          )
        Defendant.               )
                                 )
_____  )

    * * * * * * * * * * * * * * * * * * *
            ROUGH DRAFT TRANSCRIPT
             Monday, June 6, 2022
    * * * * * * * * * * * * * * * * * * *


        Rough Draft Transcript of proceedings in the at the
June 6, 2022, jury trial before the Honorable Judge Robert J.
Conrad, Jr. Presiding.

1       N   O   T   I   C   E

2           This transcript is an UNCERTIFIED ROUGH DRAFT

3   TRANSCRIPT ONLY.  It contains the raw output from the court

4   reporter's stenotype machine translated into English by the

5   court reporter's computer, without the benefit of

6   proofreading.  It will contain untranslated steno outlines,

7   mistranslations (wrong words), and misspellings.  These and

8   any other errors will be corrected in the final transcript.

9   Since this rough draft transcript has not been proofread, the

10  court reporter cannot assume responsibility for any errors.

11          This rough draft transcript is intended to assist

12  attorneys in their case preparation and is not to be

13  construed as the final transcript.  It is not to be read by

14  the witness or quoted in any pleading or for any other

15  purpose and may not be filed with any court.

16          Please contact this official court reporter to provide

17  any or all of this transcript in a final or draft form:

18                  Kathy Cortopassi, RDR, CPC

19          704-350-7493 kathy_cortopassi@ncwd.uscourts.gov

20

21

22

23

24

25

PROCEEDINGS

1

2          THE COURT:  Good morning, everyone.  We're here in

3     the matter of the United States versus Kenneth Watkins:  To

4     select a jury and begin trial.  Are the parties ready to

5     proceed?

6          MR. GUINN:  We're ready, Your Honor.

7          MR. RAEL:  Yes.  We're ready.  We do have a motion

8     to bring to the Court before we bring in the jury.  Or we can

9     bring them in and do it after.  Any way the Court wishes.

10          THE COURT:  Let's select the jury and then we'll

11     see where we are.  Madame Clerk, would you call the jury?

12          (Jury pool enters the courtroom at 9:34 a.m.)

13          (Proceedings involving the jury have been sealed

14     and are not included in this rough draft.)

15          THE COURT:  Members of the Jury, now that you have

16     been sworn and impaneled, I'm going to give you some

17     preliminary instructions to guide you in your participation

18     in the trial.

19          You have two options, neither one of them are very

20     good.  But you can see my face on the monitors in front of

21     you.  Or those of you who want to swivel in your chairs and

22     listen to me, you can do that, as well.T it will be your duty

23     to find from the evidence what the facts are.  You and you

24     alone will be the judges of the facts.  You will then have to

25     apply to those facts the law as the Court will give it to

you.  And nothing the Court may say or do during the course
of the trial is intended to indicate in any way what your
verdict should be.  The evidence from which you will find the
facts will consist of the testimony of witnesses, documents
and other things received into the record as exhibits, and
any facts that the lawyers agree to or stipulate to or that
the Court may instruct you to find.

Certain things are not evidence.  They include
things like statements, arguments and questions by the
lawyers; objections to questions are not evidence.  Lawyers
have a duty to their clients to make objections when they
believe that evidence is being offered for an improper
purpose under the Rules of Evidence.  You should not be
influenced by the objection.  If it is sustained, you would
ignore the question.  If the objection is overruled, you
would treat the answer like any other.

If you are instructed that some item of evidence is
received for a limited purpose only, you must follow that
instruction.

Testimony that the Court excludes or tells you to
disregard is not evidence and must not be considered.

And again, anything you may have seen or heard
outside the courtroom is not evidence must be disregarded.
You are to decide the case solely on the evidence presented
here in the courtroom.

1    Now, the Court instructs you that you are the sole
2    judges of the credibility of the witnesses and the weight
3    their testimony deserves.  While there is no absolute or
4    arbitrary guide or measure by which you determine the
5    truthfulness of a witness, the Court will point out to you
6    some general factors which may assist you in making that
7    determination, and these factors include:  Whether the
8    witness has any motive or reason for being truthful or
9    untruthful; the witness's interest, if any, in the outcome of
10   the case; whether there has appeared from the witness's
11   attitude or conduct any bias, prejudice, or feeling which may
12   cause that person's testimony to be influenced; whether the
13   testimony bears the earmarks of truthfulness; to what extent,
14   if any, it is corroborated or confirmed by other testimony
15   which is not questioned; or by known or admitted facts.  You
16   may also consider the intelligence and mental capacity of a
17   witness and the witness's opportunity to have accurate
18   knowledge of the matters to which the person testifies.  I
19   instruct you that you may believe all that a witness says or
20   none or believe in part and disbelieve in part.
21       Now, a few words about your conduct as jurors.
22   First, I instruct you that during the trial you are not to
23   discuss the case even amongst yourselves or with anyone else
24   nor should you permit anyone to discuss it with you.  Until
25   you retire to the jury room at the end of the case to

1    deliberate on your verdict, you simply are not to talk about

2    the case.

3         If anyone should try to talk to you about it, you

4    should bring to it the Court's attention promptly.

5         Second, do not read or listen to anything touching

6    on the case in any way.  You as jurors must decide this case

7    based solely on the evidence presented here within the four

8    walls of this courtroom.  This means that during the trial,

9    you must not conduct any independent research about the case,

10   the matters in the case, the individuals or groups involved

11   in the case, or legal concepts.

12        Now, because this is so different from how we

13   conduct our everyday affairs, I really want to stress this

14   point, that you simply are not to do any research on the case

15   while serving as a juror.  And our normal course, I think we

16   even had it in jury selection that our normal instinct is to

17   go to the social media and Google something and find an

18   answer.  And you simply are not to do this at all in this

19   case.  You cannot use any electronic device or media, such as

20   telephone, cell phones, smartphone, iPhone, blackberry or

21   computer; the Internet, any Internet service, any Internet

22   chatroom, blog, or website such as Facebook, my space,

23   LinkedIn, YouTube or Twitter; or any text or instant

24   messaging service to communicate to anyone any information

25   about the case or to conduct any research about the case

while you serve as a juror.

Your duty to follow this instruction is a serious responsibility.  The failure to follow it may result in being found in contempt of court.

Finally, do not form any opinion until all the evidence is in.  Keep an open mind until you start your deliberations at the end of the case.

If you wish, you may take notes, but if you do, remember that your notes serve merely as an aid to your own memory and not a substitute for it.  And, please, leave your notes in the jury room when you leave at night.

I've already talked about sidebar.  And I thank you for putting up with us when on occasion we have to do that.

Now, the trial is about to begin.  First the Government will make an opening statement, which is simply a forecast of the evidence.

Next, the defense attorney may, but does not have to, make an opening statement.  And I'll remind you that opening statements are neither evidence nor arguments. They're simply a forecast of the evidence.

Next, the Government will present its witnesses and counsel for the defendant may cross-examine them.  Following the Government's case tdefendant may, if he wishes, present witnesses whom the Government may cross-examine.

After all the evidence is in and I've given you

1  general instructions, the attorneys will come back and

2  present their closing arguments.  Then the Court will give

3  you final instructions on the law and ask you to retire to

4  deliberate on your verdict.

5          That's the process that we'll follow from this

6  point forward.

7          Opening statements being so close to the lunch

8  hour, normally we would go to 1 o'clock before breaking for

9  lunch.  But in this case I'll ask you to listen carefully to

10  the opening statements.  And when they're done we'll break

11  for lunch and come back to hear the presentation of evidence.

12          Government ready to make its opening statement?

13          MR. GUINN:  Yes, sir.

14          Opening opening.

15          MR. GUINN:  If it please the Court, defense

16  counsel.  Again my name is Lambert Guinn and I'm here today

17  with my tow counsel Tim Seilaff and the caseworker.  We

18  represent the United States of America in this matter.  Now

19  the defendant in this case Mr. Watkins is here today and he's

20  charged with one count of conspiracy to distribute controlled

21  substances within the Western District of North Carolina of

22  North Carolina.  Specifically the Charlotte North Carolina

23  area.  And like the judge said, opening statements are not

24  evidence and they're not argument.  What they are is a

25  forecast of what the admissible evidence will be in this

1  case.

2  And so the evidence will show that back in 2020,

3  FBI agents in Charlotte, North Carolina and CMPD officers

4  were engaged in an investigation. They were investigating a

5  music group called the pressure game rap label. Now, most of

6  the individuals in the pressure gang rap label were

7  musicians. They were about the art and they were trying to

8  make music. Within that organization, there was a smaller

9  group of individuals that sold narcotics.

10  Now, the leader of the pressure gang was an

11  individual by the name of Steven Cloud. Law enforcement

12  officers were monitoring Steven Cloud and the investigation

13  was focused on him. And so on two occasions in October of

14  2020, once October 17th, 2020, and the second time October

15  the 24th, 2020, Mr. Steven Cloud ordered narcotics from

16  Atlanta, had those narcotics brought up to Charlotte, North

17  Carolina.

18  So on October the 17ted, 2020, the evidence will

19  show that Mr. Cloud sent a woman named Jonquilla Sanders down

20  to Atlanta, Georgia, that Ms. Sanders met with the defendant

21  Mr. Watkins, she retrieved a box and brought that box back to

22  Charlotte, North Carolina and gave that tow Mr. Cloud.

23  Mr. Sanders will -- Ms. Sanders will explain that

24  the substance, she knew what was in the box because she had

25  made a similar run for Mr. Cloud before.

1    Now, law enforcement officers were listening to
2  what was going on, but given how quickly everything was
3  happening, they couldn't do anything to intercept that
4  package.
5    So, on October the 24th, 2020, there was a second
6  run.  And on that day Mr. Cloud sends a woman by the name of
7  Leticia Anderson down to Atlanta, Georgia.  Ms. Anderson
8  meets with Mr. Watkins and is on her way back up.  At this
9  point law enforcement are listening to what happens, they are
10  familiar with what had the week earlier and they stop
11  Ms. Anderson, her vehicle was searched and they fund a
12  controlled substance called but alone.  That's the controlled
13  substance we'll talk about today.  You'll have an opportunity
14  to hear some wire tap calls we anticipate see some phone
15  location information and have the opportunity to hear from
16  one of those women that made that run for Mr. Cloud.
17    As we're kind of going through this case, we're
18  going to ask that you think about three things.  First, the
19  two dates that I mentioned earlier, October the 17th, 2020,
20  and October the 24th, 2020.  Those are very important dates.
21  As you're hearing about those dates, please think about the
22  sequence of events, the order in which things happen, and
23  think about how October the 17th relates to October the 24th.
24  We think that the events that occur on October the 17th are
25  going to help inform what occurred on the 24th and the events

that occurred on the 24th are going to help shed some additional light about what happened October the 17th. So think about those two days.

The second thing that we're going to ask you to think about is that Mr. Watkins is charged with participating in the conspiracy. So while it's important to think about who had the controlled substance when and when the items were seized, what's the additional items that are important, the most important thing is the nature of the agreement. Who was participating in this transaction and what was going on? Think about all the parties and the role that they played in this particular investigation.

And, finally, and what we think is the most important thing is that you're going to hear additional name, some of which will testify in court, some of which may not testify in court. There's a conspiracy involving multiple people. But today is Mr. Watkins' day in court. We ask that you think about the role that he played in this case. Think about the actions that he took in this particular case.

We think the evidence will show that none of this, none of these events happened without Mr. Watkins down in Atlanta first putting these items into the stream of commerce. And because of that, we believe the evidence is going to establish that Mr. Watkins is guilty of conspiring with other individuals to distribute narcotics and at the end

1   of this trial we're going to ask that you return a verdict of
2   guilty.  Thank you for your time and your participation in
3   this case.

4           THE COURT:  Mr. Rael?

5           MR. RAEL:  Thank you, Your Honor.  Opening opening.

6           THE COURT:  You can speak from there or from the
7   center, whichever is your preference.

8           MR. RAEL:  All right.  I think I'll stay here.  If
9   you all can move to me.

10          Just a very quick introduction as I said just I
11  think a few minutes ago.  I'm Samuel rail and I practice in
12  Atlanta, Georgia and have been since 1974 doing these kind of
13  cases, which are criminal cases.

14          Sometimes people wonder how can I be in Atlanta and
15  yet this is in Charlotte?  But in Federal Court, you can try
16  cases anywhere with the judge's permissions.  And I've tried
17  them in Chicago and in New York and Cincinnati and any number
18  of other places I can't remember.  And so that's one thing.

19          And then sometimes people ask why am I doing this
20  in Atlanta instead of in Charlotte here?  Because you know
21  Atlanta's just loaded with traffic and loaded with people and
22  all that kind of thing.  And they wonder why am I there
23  instead of here?  I don't know.  But here I am.  And now
24  we're going to deal with this case.

25          As the United States Attorney said, this thing

started with a gang called the pressure gang.  Now, really, they are a violent gang, a gang that, for the most part, is in name only a rap gang.  And both the FBI will be here today and ATF and Homeland Security and Mecklenburg police, they all had their eye on this pressure gang.

Then you have a situation where you have a lot of other people involved.  They're talking about two.  They're talking about a Sanders.  They're talking about an Anderson.

I noticed that they indicated that only one of these women who ran for cloud would be there before the Court.

By the way, this fellow named cloud, really, everybody knows him by zitty.  And everybody knows my client by Kenny man.  And nobody would really know him otherwise. He basically Ziggy is a mentor for my client.  My client, who's before you today, is a fellow who is an entertainer and goes around and does rap and does rap with this Ziggy.  And his whole life is about nothing but music.  Everything that he touches is about music and is about the performing of that music.  And it then happens that Ziggy, who is the mentor to Mr. Watkins, Kenny man, all of a sudden it turns out, and I say all of a sudden because everybody doesn't know everybody and how they do business, this guy, Ziggy, is a bad dude. He's a guy who not only is running the pressure gang but he is running drugs everywhere, cocaine and that Eutylone and

everything you could imagine.  He carries a gun.  He's pled guilty to the same thing that Mr. Watkins is now here before you to determine.  Not only did he plead guilty but every single other person who was involved in this conspiracy decided to plead guilty.  And there were many of these people besides the people that were mentioned there was a fellow named turn ham.  He was buying narcotics 15 times from CIA agents.  Then you had one after the next.  Wallace and he was considered a leader in this pressure gang.  And when you get the indictment, you'll see how all of these people were involved one way or the other in this.

So, Mr. Watkins sits here and he asks himself: What is he doing here?  He has never been in Charlotte until now.  He knows nothing about it.  The two ladies that they are saying that he dealt with with drugs, he doesn't even know, ever.  And yet somehow -- he does know Ziggy.  He's been around Ziggy for many, many years.  And the evidence will show that he has been dealing with him on music forever.

But, see, in the rap business, the money and the notoriety is in Atlanta.  It's not in Charlotte.  In Atlanta is where everybody wants to be, where Watkins is, Kenny man.  And in Atlanta, that's where he goes.  So now these two people, he doesn't know them, but they know him, at least one of them, this Sanders lady.  Sanders has she loves to party.  He knows that.  She knows that.  That's what she does.  And

1  it begins July the 4th.  A day that everybody can recognize.

2  And at that time she wants to be -- the main thing she wants

3  to be is part of some sort of record label.  Whether it's

4  Mr. Watkins who has a record label or it is Ziggy who has a

5  record label or it's pressure gang folk.  She definitely

6  wants to be part of it.  This is her dream is to be part of a

7  situation where she can also, instead of being a wannabe,

8  she's somebody.

9          And so Ms. Sanders then goes to a party July the

10 4th.  And unfortunately or fortunately, Ms. Sanders has some

11 kind of drug habit.  I don't -- we'll let her say what her

12 drug of choice is.  We know she's a huge drinker.  And at the

13 time of July 4th, she does all of that and more.  And the

14 evidence will further show you that then there's a little

15 confrontation, more than a little confrontation, a large

16 confrontation.  We've got a woman who does a lot of drug talk

17 and comes over and now you've got Kenny man here.  And she

18 goes over and she says some very nasty things.  And he could

19 ignore it.  But didn't ignore it.  And he caught her up on

20 that and said you will not do this.  On July 4th, again.  She

21 didn't like that.  Not even one little bit.

22          So when the time came to go to the FBI and say what

23 happened, it was very easy, easy peasy for her to come to

24 say, yeah, he's the one that I got drugs from.  Even though,

25 of course, the evidence shows that she didn't know what was

1   in a box.  But the box was given back to Ziggy.  And from

2   that, they conclude how that a drug transaction.

3        She's supposedly has a wad of cash, several was of

4   cash.  And she gives that to Kenny man.  And from that they

5   conclude, well, there was some was of cash.  We're the FBI.

6   And so she got a box.  Drugs.  That's the case that they will

7   have as it relates to Ms. Sanders.

8        Now, as to Ms. Anderson, this is really something

9   special because up until just a few days ago, the first of

10   June, no one really knew what was Ms. Anderson going to say?

11   Was she going to say, like Ms. Sanders has said, it's him, or

12   something different?  Who knew?  Except that both United

13   States Attorneys as well as a Stephen Parker decided to

14   interview her at the jail where she was housed and where she

15   stays.  And thank goodness, actually, that they did, because

16   then the truth came out, which is verified by witness after

17   witness that we have as to what we know happened.

18        She said she never, ever went to Mr. Watkins'

19   studio.  She said that she never had met him until that very

20   day.  She said that she had never spoke with him on the

21   phone.  It might have been a three-way, but that's it.  She

22   said, more important, that she never, ever, ever got any

23   drugs from him.  That she got it from someone else, didn't

24   want to name who that person was.  But it was definitely not

25   him whatsoever.

And then money that Mr. Watkins had, he actually gave to Ziggy for stuff that had to do with music. And she said that she didn't really want to be a witness for the defense. Well, she's under subpoena. And maybe she will, maybe she won't. I don't like to bring people in who are under subpoena and examine them like that. But that may well occur. And it may not. But we do know that when the FBI came and both of those U.S. Attorneys came, they said that on that day that they're trying to talk about, which is October the 24th, she said she did not supply any pills to him. She met someone else. And here's the evidence. She got there in Charlotte maybe 10 in the morning. When she got money that she was going to get from Mr. Watkins for Ziggy for music, that was about at least 11:30 or thereabouts. At 10 o'clock she did her deal with this other person who she won't tell you who it is because she says that he's not involved in the conspiracy and I ain't telling. Okay. That's up to her. But not him. At all. She says that to these fellows. But yet they still want to maintain that when there was telephone calls, maybe she did. And what calls are the real question here? You will see that there's something also very interesting that happened here. The very night that he's entertaining at a club, club diamond in Atlanta, and they finish late, and what happens? He gets shot. Someone comes to his studio and there's a shooting. It's

important.  Because the shooting helps the witnesses know
what really occurred between Ms. Anderson, besides what
Ms. Anderson says, and knows what happened, knows that what
happened there was that he was lucky to save his life, knows,
and we have evidence to prove that but for him helping
someone, someone would have been in big, big trouble.  His
interest in trying to do some kind of drug deal after that,
was something else, zero point zero, nada.  Does not do any
drugs of any kind ever.  He is a Muslim.  It's against his
way to do anything like that.  And he has a Muslim wife,
which differs apparently from a regular wife because they
don't live together and they don't stay together and it's
different.  Let her explain.  But what I know is that at the
end of the day, he is a fellow who works and the evidence
will show all the time, day and night, has a trucking
business while he does his studio and the most important
thing of all is the music.  And everyone apparently wants to
be involvedle in music businesses.  But very few people get
to be involved in the music business.  It's not easy.  And
it's not easy because it's not how you sing or how you act or
how you dance, but it's in distribution.  And if you don't
have good distribution, you don't have anything at all.  He
can distribute like no one can and does that all the time.
That's his life.  Along with his life that he tries to live
all the time with his kids and his family and everything in

1  between.  But that's his essence.  And yet he works
2  everywhere every time but they decide to bring a case based
3  upon one person who says he didn't do it and now one person
4  who says yeah, he did.  But when that one person who says
5  yeah, he did, no.  Look, there's something further.  They're
6  not just coming out of thin air about this Anderson.  Ms.
7  Anderson got stopped right after she met with Mr. Watkins.
8  When she got stopped, when I say right after, that may be
9  about 11:30, 12 o'clock, something like that.  She gets
10  stopped by the police Georgia, Franklin Georgia, small town
11  Georgia, because they say that she's speeding.  And, not
12  really.  It's because the FBI is calling and saying:  We
13  think there may be a drug transaction going on.  And she gets
14  stopped.  And when she gets stopped, they find almost $5,000
15  in her money and they find -- which she got from Kenny man,
16  which will prove to you is true and then also got -- and she
17  also had in her car 5.3 pounds of dangerous drugs, this
18  Eutylone.  The Eutylone is like MDMA only it's not mated by
19  the folks over at Pfizer, it's made, I don't know, somebody
20  in a bathtub.  And they make that, and those drugs were found
21  in her car.  So they try to put two and two together and they
22  say well, she met with Kenny man and she got stopped at 2 in
23  the afternoon, she must have gotten these drugs from him, who
24  else?  Even though 10 a.m. we know precisely that she got the
25  drugs from her own and from other evidence that we will

1   present to you that will have you understand absolutely and

2   completely without hesitation of any kind that she got them

3   from someone else.  Period.

4         Let the evidence show you what we know, that person

5   after person after the person has come here from Atlanta and

6   gone to the expense to be here to talk about the details of

7   this case, and every single one of those people, without

8   exception, will show you that this is a terrible injustice.

9   And we are here to deal with justice.  And you will discover

10   that this man is not guilty.  Thank you.

11       THE COURT:  Members of the Jury, normally we'd go

12   into the evidence.  But it's over the noon hour.  And I think

13   what we'll do, rather than start with the evidence and break,

14   we'll take our lunch hour at this time and come back for the

15   presentation of evidence.

16        While you take a lunch break, I would ask you to do

17   two things.  One is not talk about the case with yourselves

18   or anyone else.  The second one is to keep an open mind

19   because all you've heard right now is the opening statements

20   of the attorneys.  You haven't heard any evidence at all.

21       And so with those two instructions, we'll take a

22   lunch break and ask you to be back at 1:15.

23       (The jury left the courtroom at time     .m., and the

24       following proceedings were had out of the presence of

25       the jury.)

1          THE COURT:  At ease, we'll come back at 1 cloak.

2    If there's any legal issues to take up then and be ready for

3    the jury to come back at 1:15.

4               (Recess held.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25