UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:20-cr-385-MEO-DCK-9

| UNITED STATES OF AMERICA, | ) |
| --- | --- |
| Plaintiff, | ) |
| vs. | ) MEMORANDUM AND ORDER |
| KENNETH JEROME WATKINS, | ) |
| Defendant. | ) |

**THIS MATTER** is before the Court on Defendant's pro se Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence (Doc. No. 417).

I.  BACKGROUND

The Defendant was charged along with eight codefendants with conspiracy to distribute and possess with the intent to distribute a controlled substance, i.e., a detectable amount of cocaine, cocaine base, methamphetamine (actual), and eutylone, in violation of 21 U.S.C. §§ 841(a)(1) and 846. (Doc. No. 93: Third Superseding Indictment).

The Defendant proceeded to a three-day jury trial. See United States v. Watkins, 111 F.4th 300, 304-06 (4th Cir. 2024) (case summary). The Government presented evidence that codefendant Steven "Ziggy" Cloud operated a Charlotte, North Carolina-based record label. (Fourth Cir. Case No. 23-4094 Joint Appendix ("JA") 56-60); Suspecting that Cloud and others involved with his label were dealing drugs, investigators obtained a wiretap for Cloud's cellphone. (JA 72). Investigators eventually determined that Kenneth "KennyMan" Watkins—an Atlanta, Georgia-based rap musician who operated a recording studio called K3Soundz—dealt drugs with Cloud. (JA 62-63, 195). Evidence introduced at trial centered around three trips that Cloud directed two

couriers to take from Charlotte to Atlanta to obtain pills for him. (JA 62). The first trip, in the summer of 2020, involved Jonquilla Sanders. (JA 121). At Cloud's instruction (but without any money from Cloud), Sanders traveled to Atlanta to "pick up some pills." (JA 122). While there, Sanders received what she estimated to be 10,000 pills from someone she described as a tall, light-skinned black man who drove a red sportscar—a man she later testified was not Watkins. (JA 122-23, 153-54). Sanders then drove back to Charlotte and left the pills in Cloud's car. (JA 123).

The second trip took place from October 16 to 17, 2020. (JA 124). Cloud told Sanders that it would be "[t]he same thing" as before. (JA 125). Unlike the first trip, however, Cloud handed Sanders a stack of cash, which she never counted. (JA 134). Also unlike the first trip, Sanders did not travel alone; Cloud sent along a man called "Reggie." (JA 134-35). During this second trip, investigators intercepted calls among Sanders, Cloud, and Watkins. (JA 136-37). Those calls linked the three of them and suggested that Sanders was obtaining drugs from Watkins in Atlanta. The calls reflect that Sanders was to meet Watkins at Club Diamonds, where Watkins was performing—although Watkins explained over the phone that he would not "have it in there." (JA 138-39). Cloud also instructed Sanders to give the cash to Watkins and to speak only to him. (Fourth Cir. Case No. 23-4094 Supplemental Appendix ("SA") 8). Sanders duly complied.

The intercepted calls and Sanders's testimony further established that, after Watkins finished performing at Club Diamonds, he and Cloud directed Sanders to drive to K3Soundz. Watkins eventually arrived at the studio and told Sanders that he still did not have "what [she] was coming to get." (JA 142). Sanders followed Watkins in her vehicle to a residence located about fifteen minutes away. (Id.). Watkins entered the house and soon emerged with a box, which he gave to Sanders. (JA 143). Sanders never looked inside the box, but assumed that it contained pills based upon her past dealings with Cloud and his remark about the "same thing." (JA 159, 163,

2

168). She returned to Charlotte and delivered the box to Cloud. (JA 145-46).

The third drug-supply trip to Atlanta occurred later that month. Rather than Sanders, this trip involved another woman, Latisha Anderson. (See JA 191). A week before the trip, Anderson texted Cloud, asking, "You have pills" and Cloud responded yes. (SA 43). He followed with another text telling Anderson that someone had "let sumone steal my bag wit 4000 in it last nite." (Id.). Anderson responded, "Damn omfg," to which Cloud replied, "Yea man shit got me tight." (Id.). Two days later, Anderson texted Cloud and told him that she "needed pills but I guess I'll get them tomorrow." (SA 41). Cloud inquired of Anderson: "I'm almost ready again u gone take dat trip?" (Id.). Anderson asked when, and Cloud stated that he did not know but had about "2000 left." (SA 42).

Anderson drove to Atlanta on October 24, 2020. She arrived at ten o'clock in the morning, around the time the transaction was scheduled to take place. Frustrated after waiting an hour, Anderson began to return to Charlotte when Cloud finally called her at 11:25 a.m. (JA 291). Anderson complained that she had been on the road since 6:30 a.m. (SA 11). Cloud said he would try to call Watkins. Cloud then managed to connect Watkins to the call and explained that Anderson had been waiting for an hour. Watkins responded, "I'm fixing to go straight to her right now." (SA 12). Cloud gave Anderson the address to K3Soundz, which Anderson said was seventeen minutes away. (SA 13). Twenty minutes later, at 11:54 a.m., Watkins told Cloud to let Anderson know he was on the way and would arrive in ten minutes. At 12:02 p.m., Cloud relayed the message to Anderson. (SA 15). At 12:42 p.m., Cloud called Anderson and asked if she was "situated" and Anderson responded, "Yeah." (SA 16).

Based on their monitoring of Cloud's phone and the similarities with Sanders's earlier trips, investigators believed that Watkins had supplied Anderson with drugs. (See JA 187-90). They

3

arranged for a uniformed local police officer to stop Anderson on the interstate highway between Atlanta and Charlotte. (JA 190). After a drug canine alerted for narcotics, police discovered in the car $4,638 in cash in the driver's center console and 8,909 pills inside a Versace box. (JA 217, 220-21, 242). The pills were divided into eleven plastic bags by color and shape. (JA 242-43).

Eleven of the pills—one from each of the plastic bags—were later tested and found to contain the Schedule I controlled substance eutylone, a part of the cathinone family. (JA 242-45). A crime lab analyst testified that the rest of the pills were visually consistent with the 11 pills that he tested. (JA 245-46).

The Defendant's theory of the case was that he is a Muslim man who has never done drugs, that he has never been to Charlotte, that his relationship with Cloud is limited to their music, and that the FBI "had the wrong man." (See JA 396). Counsel planned to call "about a baker's dozen witnesses" addressing Defendant's lack of involvement in the drug transaction, and about Sanders' activities and the unopened box. (JA 295). The defense called Latisha Anderson, Lashanda O'Neill, and Kizzy Childs in support of this theory. (JA 297, 332, 344).

Anderson testified about her traffic stop on October 24 during which drugs were found in the vehicle she was driving. (JA 300). She testified that she does not know the Defendant, and that she kept telling the Government that "they got the wrong guy." (JA 305-08, 311). However, she refused to identify the person to whom the pills allegedly belonged. (JA 315).

O'Neill testified that the Defendant is a family friend from whom she rents work space. (JA 334). She testified that she saw a man, who was not the Defendant, give Anderson a Versace box at a gas station on October 24, 2020. (JA at 338).

Childs testified that she is the Defendant's "Islamic wife" and the mother of his children. (JA 345). She testified that the Defendant's relationship with Cloud was limited to their music,

4

that the Defendant is a "very" good father who is "into his religion," and that it is "not in his character to do drugs." (JA 353-54). On cross-examination, the Government asked Childs whether the Defendant's music is "gangster rap," and whether she recognized some of the Defendant's song lyrics. (JA 357-61). Defense counsel objected and the Court held a sidebar discussion as follows:

> THE COURT: Your objection?
>
> MR. RAEL: I just don't see the relevance of all of that.
>
> THE COURT: What's the relevance?
>
> MR. GUINN: Well, Your Honor, this has already been entered into Direct. First was inquiry into the types of performances and type of music the Defendant does and the types of collaborations he does with Steven Cloud. Those are both inquired into on Direct.
>
> Additionally, Mr. Rael elicited character evidence about his client from his wife; that he's a good Muslim and anything like this is out of character.
>
> THE COURT: Normally I would prohibit this kind of cross on lyrics, but I do think the door was open wide on character evidence on Direct with respect to character traits of the defendant. so I think this is responsive to it and covered by Rules 404 and 405. And so any objection I'll deny, but I will say that it'll get cumulative soon.

(JA 359-60). In all, the jury heard a few lines of the Defendant's lyrics including "I'm doper, for real" and "I've got truckloads and bales, don't even put it on a scale." (JA 357-61, 364). Childs testified that she was familiar with those lyrics. (JA 360-61, 364). At the conclusion of Childs's testimony, defense counsel announced that the defense would rest without calling any further witnesses, and that the Defendant had decided not to testify. (JA 365-66).

The jury found the Defendant guilty as charged. (Doc. No. 260: Verdict).

The Presentence Investigation Report ("PSR") estimated that approximately 4,391 grams of eutylone were reasonably foreseeable by the Defendant. (Doc. No. 291: PSR at ¶¶ 37-39). After

5

Case 3:20-cr-00385-MEO-DCK   Document 433   Filed 01/16/26   Page 5 of 20

applying the 1:380 gram ratio applicable to synthetic cathinones, the converted drug weight was 1,668.58 kilograms, resulting in a base offense level of 30 pursuant to U.S.S.G. § 2D1.1(a)(5). (Doc. No. 291: PSR at ¶¶ 41, 46). The Defendant had three criminal history points and a criminal history category of II. (Id. at ¶¶ 60-61). The resulting advisory guideline range was between 108 and 135 months' imprisonment and three years of supervised release. (Id. at ¶¶ 85, 88).

The Defendant filed PSR objections with regards to the drug amount and the converted drug weight calculation, inter alia: only the drugs actually seized by law enforcement should be included; only the 11 pills that were actually tested and found by the laboratory to be eutylone should be included; the law enforcement estimate that 2,000 grams of eutylone were involved in the October 16-17 transaction should not be included; the "Typical Weight Per Pill Table" for MDMA should be used pursuant to U.S.S.G. § 2D1.1 Application Note 9 to arrive at the converted drug weight with a 1:250 milligram conversion ratio. (Doc. No. 289). The Defendant also requested a downward departure sentence pursuant to U.S.S.G. § 2D1.1 Application Note 27(D) because the substance is a rare synthetic cathinone. (Id.; Doc. No. 321).

The Defendant stated at the sentencing hearing that he had the opportunity to read the PSR, understood it, and had sufficient time to review it with counsel. (Doc. No. 347: Sentencing Tr. at 3). Counsel presented argument regarding Defendant's objections to the drug weight and calculation, and the request for a downward departure. (Id. at 6-9). With regards to the argument that the drug amount should only be based on the 11 pills actually analyzed by the chemist, the Court noted that "[s]ampling of drugs is routine thing in Federal Court," and asked whether any of the pills seized that were chemically tested turned out not to be a controlled substance. (Id. at 5). Defense counsel responded, "I don't see any, no." (Id.).

The Government requested a sentence of more than 144-months' imprisonment because a

6

lesser sentence would be inadequate to sufficiently deter Defendant's criminal conduct. (Id. at 23).

The Court overruled the drug weight and conversion objections, and found that: the offense level is 30; the ratio of 1:380 for the drug conversion was correct; the October 24 transaction, alone, very closely approached the 30 base offense level; the phone messages and testimony about the boxes made the government estimate reasonable as to the October 16-17 transaction; and a downward departure was not warranted. (Id. at 16-17). The Court sentenced the Defendant within the advisory guideline range to 120 months' imprisonment followed by three years of supervised release. (Id. at 26; Doc. No. 341: Judgment).

The Defendant argued on direct appeal *inter alia* that the Court erred by: permitting inquiry about Defendant's music lyrics because such is highly prejudicial hearsay and propensity evidence pursuant to Rule 404(a)-(b); calculating the drug quantity attributable to the Defendant; calculating the converted drug weight; and denying a downward departure. The Fourth Circuit affirmed on August 2, 2024. United States v. Watkins, 111 F.4th 300 (4th Cir. 2024).

As to the rap lyrics, the Fourth Circuit found that the Court reasonably concluded that Childs's testimony that it was not in Defendant's character to do drugs, and about his faith, fatherhood, and work ethic was character evidence that opened the door to rebuttal character evidence pursuant to Rule 404(a)(2)(A). However, the prosecution "[d]id not even go that far" in that it did not "offer evidence" at all. Id. at 312. Rather, pursuant to Rule 405(a), the prosecution only inquired into specific instances of Defendant's conduct, i.e., whether Childs was "familiar" with certain lyrics and it accepted Childs's answer each time without pushing for more detail. Id. "So while the prosecution might have exploited Watkins's decision to 'open the door' to character evidence even more than it did, the district court did not err by permitting the limited inquiry into Watkins's lyrics." Id. at 312-13.

7

Case 3:20-cr-00385-MEO-DCK    Document 433    Filed 01/16/26    Page 7 of 20

As to sentencing, the Fourth Circuit found that the Court "properly relied upon the testing performed by the prosecution's forensic chemistry expert, which concluded that the 8,909 seized pills contained 2.39 kilograms of eutylone;" the expert's procedure established the drug quantity by a preponderance of the evidence; and the Court "quite reasonably concluded that Watkins delivered to Sanders a box containing an estimated two kilograms of eutylone." Id. at 314-15. It found no error in calculating the converted drug weight because eutylone is a synthetic cathinone to which the 1:380 gram ratio applies. Id. at 315. It further found that the Court understood its authority to depart downward under the guidelines, but that it did not believe that such was warranted by the facts of the case such that the departure decision is not reviewable. Id. at 315-16.

The Defendant filed the instant Motion to Vacate on February 24, 2025.[1] (Doc. No. 417). He argues that: (1) counsel was ineffective for failing to properly challenge the admissibility of prejudicial rap lyrics, address the drug quantity calculation and testing before trial, at trial and at sentencing, challenge the offense level; argue for a downward departure, call witness who would have undermined the Government's case, and present the Defendant with a plea offer that would have likely resulted in a shorter sentence and which Defendant would have accepted; and (2) the prosecution violated the Defendant's due process rights by using prejudicial rap lyrics, failing to allow independent testing of physical evidence, and failing to disclose material evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963). (Docs. 417, 417-1). The Defendant asks the Court to grant an evidentiary hearing, vacate his conviction and sentence, and grant any other relief to which he may be entitled. (Doc. No. 417 at 13; Doc. No. 417-1 at 1). The Government filed a

---

[1] The Defendant filed the Motion pro se. Houston v. Lack, 487 U.S. 266, 276 (1988) (establishing the prisoner mailbox rule); Rule 3(d), 28 U.S.C. foll. § 2255 (addressing inmate filings). Counsel later appeared and filed a Reply on Defendant's behalf. [See Doc. 430).

8

Response opposing relief.[2] (Doc. No. 428). The Defendant filed a Reply. (Doc. No. 430). This matter is ripe for disposition.

## II. SECTION 2255 STANDARD OF REVIEW

A federal prisoner claiming that his "sentence was imposed in violation of the Constitution or the laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a).

Rule 4(b) of the Rules Governing Section 2255 Proceedings provides that courts are to promptly examine motions to vacate, along with "any attached exhibits and the record of prior proceedings . . ." in order to determine whether the petitioner is entitled to any relief on the claims set forth therein. After examining the record in this matter, the Court finds that the arguments presented by Defendant can be resolved without an evidentiary hearing based on the record and governing case law. See Raines v. United States, 423 F.2d 526, 529 (4th Cir. 1970).

## II. DISCUSSION[3]

### 1. Ineffective Assistance of Trial Counsel

The Sixth Amendment to the U.S. Constitution guarantees that in all criminal prosecutions, the accused has the right to the assistance of counsel for his defense. See U.S. Const. Amend. VI. To show ineffective assistance of counsel, a petitioner must first establish deficient performance by counsel and, second, that the deficient performance prejudiced him. See Strickland v.

---

[2] The Government has filed materials including an Affidavit from Defendant's trial attorney. (Doc. 428-2). The Court finds the affidavit unnecessary to resolve Defendant's claims. As such, the Court need not make any credibility determinations and no evidentiary hearing is required.

[3] The claims have been reorganized and restated.

Washington, 466 U.S. 668, 687-88 (1984). The deficiency prong turns on whether "counsel's representation fell below an objective standard of reasonableness ... under prevailing professional norms." Id. at 688. A reviewing court "must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." Harrington v. Richter, 562 U.S. 86, 104 (2011) (quoting Strickland, 466 U.S. at 689). The prejudice prong inquires into whether counsel's deficiency affected the judgment. See Strickland, 466 U.S. at 691. A petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. A petitioner "bears the burden of affirmatively proving prejudice." Bowie v. Branker, 512 F.3d 112, 120 (4th Cir. 2008). If the petitioner fails to meet this burden, a reviewing court need not even consider the performance prong. Strickland, 466 U.S. at 670.

### A. Plea Offer

The Sixth Amendment right to the effective assistance of counsel "extends to the plea-bargaining process." Lafler v. Cooper, 566 U.S. 156, 162 (2012). Counsel has a duty to communicate formal offers from the prosecution to the defendant, Missouri v. Frye, 566 U.S. 134, 145 (2012), and "to inform a defendant of the advantages and disadvantages of a plea agreement and the attendant statutory and constitutional rights that a guilty plea would forego," Libretti v. United States, 516 U.S. 29, 50-51 (1995).

"To show prejudice from ineffective assistance of counsel where a plea offer has lapsed or been rejected because of counsel's deficient performance," a petitioner must "show a reasonable probability that the end result of the criminal process would have been more favorable by reason of a plea to a lesser charge or a sentence of less prison time." Frye, 566 U.S. at 147. Namely, a

petitioner must "show the outcome of the plea process would have been different with competent advice." Lafler, 566 U.S. at 163. That is, he must show that "but for the ineffective advice of counsel there is a reasonable probability" that he would have pleaded guilty on terms that the prosecution and the court would have accepted, and the conviction or sentence under the plea "would have been less severe than under the judgment and sentence that in fact were imposed." Id. at 164.

The Defendant contends that: he "has been informed that the Government offered a plea agreement to his counsel, which … would very likely have resulted in a shorter sentence than the one imposed by the Court;" counsel never presented a plea offer to Defendant; counsel told the Defendant that "he would receive no more than seven years if found guilty at trial;" and, "[i]f counsel had shown [Defendant] the plea agreement and explained that [he] likely faced 10 years if convicted, [he] would have accepted a plea agreement." (Doc. No. 417-1 at 7-8).

The Defendant fails to identify the circumstances in which he allegedly learned of an unconveyed plea offer, nor does he proffer the offer's terms. Absent that information, the Defendant cannot demonstrate that there is a reasonable probability he would have accepted the offer, that it would have been acceptable to the Court, and that it would have resulted in a more favorable outcome. See generally United States v. Dyess, 730 F.3d 354 (4th Cir. 2013) (vague and conclusory allegations contained in a § 2255 petition may be disposed of without further investigation by the district court). This vague, conclusory, and speculative claim is, therefore, dismissed and denied.

### B. Music Lyrics

The Defendant contends that counsel was ineffective for failing to "properly" object on First Amendment and Rule 403 grounds when Defendant's rap lyrics were introduced "as evidence

11

of criminal conduct…." (Doc. No. 417-1 at 2). The Defendant argues that this prejudiced him because "[t]he government heavily relied on the lyrics in arguing [his] guilt, using them to paint him as a drug dealer…." (Id.).

The Defendant's Rule 403 argument fails because, as the Fourth District found on direct appeal, the lyrics were not introduced as evidence. See Watkins, 111 F.4th at 311-12; see Boeckenhaupt v. United States, 537 F.2d 1182, 1183 (4th Cir. 1976) (claims decided on direct review may not be recast "under the guise of collateral attack"); see also United States v. Roane, 378 F.3d 382, 396 n. 7 (4th Cir. 2004) (absent "any change in the law," defendants "cannot relitigate" previously decided issues in a § 2255 motion). Although Childs opened the door to Defendant's character, the prosecutor merely asked whether Childs recognized a few of the Defendant's rap lyrics pursuant to Rule 405(a) in a manner that was not cumulative. (See JA 359-60). The Fourth Circuit has already determined that this brief inquiry was proper. See Watkins, 111 F.4th at 311-12. The Defendant's present conclusory argument that counsel should have argued that this extremely limited inquiry violated Rule 403, is rejected. See generally United States v. Moore, 27 F.3d 969, 974 (4th Cir. 1994) (holding that when the defendant "'opened the door' by soliciting favorable opinions about his character, the district court properly allowed the government to rebut the offered testimony"); see, e.g., United States v. Jaensch, 552 F. App'x 206, 212–13 (4th Cir. 2013) (limited rebuttal testimony about the defendant's criminal record was invited by the defense and was not of the character to inflame the passions of the jurors or to cause them to disregard the facts of the case). The Defendant's contention that he was prejudiced because the Government relied on the lyrics in the closing argument is conclusively refuted by the record. (See JA 382-95, 403-07).

The Defendant's First Amendment argument also fails. "[T]he Constitution does not erect

a *per se* barrier to the admission of evidence concerning one's beliefs and associations at sentencing simply because those beliefs and associations are protected by the First Amendment. Dawson v. Delaware, 503 U.S. 159, 165 (1992). Whether the Defendant had a First Amendment right to rap about drugs is irrelevant to whether Childs's character testimony opened the door to the foregoing inquiry under Rule 405. Counsel was not deficient for declining to present these frivolous arguments and, had counsel raised them, they would have been rejected.

### C. Uncalled Witness

The Defendant contends that counsel was ineffective for failing to call Janae Epps and Asia Spalding at trial because they "witnessed [Defendant] give a box of concert flyers on October 16 or 17," and these witnesses' testimony "would have shown what was inside the box that Ms. Sanders received." (Doc. No. 417-1 at 7).

"[T]he decision whether to call a defense witness is a strategic decision demanding the assessment and balancing of perceived benefits against perceived risks, and one to which we must afford enormous deference." United States v. Terry, 366 F.3d 312, 317 (4th Cir. 2004) (quotation marks, brackets, and ellipses omitted). To demonstrate prejudice based on a claim of uncalled witnesses, a petitioner "must show not only that this testimony would have been favorable, but also that the witness would have testified at trial." Alexander v. McCotter, 775 F.2d 595, 602 (5th Cir. 1985). A defendant claiming ineffective assistance of counsel based on an uncalled witness should make a proffer of testimony from the uncalled witness. See Bassette v. Thompson, 915 F.2d 932, 940-41 (4th Cir. 1990).

The Defendant has failed to proffer the testimony that Epps and Spalding would have presented at trial, and he has failed to demonstrate that they were available to testify. See, e.g., Howard v. Lassiter, 2013 WL 5278270, at *3 (M.D.N.C. Sept. 18, 2013) (unpublished) (holding

claim of uncalled witnesses failed where petitioner did not specify the identity of the witnesses, the substance of their anticipated testimony, or how this testimony would have produced a different outcome at trial). Defendant's vague suggestion that these witnesses would have testified that they saw the Defendant give a box of fliers to someone at some point during a two-day period during which a drug transaction also occurred, is insufficient to demonstrate either deficient performance or prejudice. See, e.g., United States v. Sutherland, 103 F.4th 200 (4th Cir. 2024) (denying ineffective assistance claim where the defendant failed to show how the proffered testimony would have in any way undermined his conviction); Dyess, 730 F.3d at 354. There is no reasonable probability that, even if these witnesses were available for trial and would have testified about a box of fliers, this would have changed the case's outcome in light of the strong evidence of the Defendant's guilt including cell phone records and recorded phone calls. [See, e.g., JA 128-29, 143, 155). Accordingly, this claim is dismissed and denied.

### D. Drug Amount

The Defendant contends that counsel was ineffective with regards to the drug amount by failing to: challenge the Government's "speculative" drug quantity evidence, including the estimated two kilos that Sanders transported on October 16-17; challenge the Government's laboratory testing and methodology, including the conclusion that the substance is eutylone, a synthetic cathinone; compare eutylone to MDMA and argue that the "typical weight per pill table" should be used; request funds and samples for independent testing; file a Daubert motion and request a hearing on the same; and preserve a portion of the drugs for later testing. The Defendant contends that this "could have" supported a lower drug quantity calculation and offense level. (Doc. No. 417-1 at 4-6).

These claims are conclusively refuted by the record insofar as counsel raised many of these

14

Case 3:20-cr-00385-MEO-DCK   Document 433   Filed 01/16/26   Page 14 of 20

issues before the Court and on direct appeal. (See Docs. 289, 321, 347). The Fourth Circuit concluded that: the seized pills contained 2.39 kilograms of eutylone; the expert's procedure established the drug quantity by a preponderance of the evidence; the finding that the Sanders box contained two kilograms of eutylone was reasonable; and the 1:380 gram conversion ratio applies because eutylone is a synthetic cathinone. Watkins, 111 F.4th at 312-15.  The Defendant's attempt to revisit these issues is rejected. Boeckenhaupt, 537 F.2d at 1183; Roane, 378 F.3d at 396 n. 7. The Defendant's additional arguments, including that counsel should have hired an independent expert, filed a Daubert motion, and preserved drugs for future testing, are vague, conclusory and speculative. See Dyess, 730 F.3d at 354. Moreover, the Defendant has failed to establish prejudice. His contention that raising these issues "could have supported" a lower drug quantity calculation fails to establish a reasonable probability that raising any of these arguments would have resulted in a lower sentence. See Dyess, 730 F.3d at 354; United States v. Rangel, 781 F.3d 736, 746 (4th Cir. 2015) (defendant was not prejudiced by counsel's allegedly ineffective assistance with regards to the court's drug weight finding where he pointed to no argument or factor that his counsel should have raised that the district court failed to consider and which might have changed its view). The Defendant's claims about the drug quantity are, therefore, dismissed and denied.

### E.  Downward Departure

The Defendant contends that counsel failed to present a "comprehensive" motion for downward departure pursuant to Application Note 27(D) of the U.S. Sentencing Guidelines. (Doc. No. 417-1 at 6). This, he argues, resulted in a higher base offense level which prejudiced him.

This claim is conclusively refuted by the record in that counsel moved for a downward departure based on Application Note 27(D), and presented argument about the same at the sentencing hearing. (See Doc. No. 321 at 10; Doc. No. 347 at 9). The Fourth Circuit concluded on

15

direct appeal that the Court understood that it had discretion to award a downward departure and that it felt that such was not warranted in this case. Watkins, 111 F.4th at 315-16. The Defendant has not identified any additional argument or evidence that reasonable counsel would have presented in this regard which had a reasonable probability in resulting in a lower sentence. Dyess, 730 F.3d at 354. This vague, conclusory, and speculative argument is, therefore, dismissed and denied.

2. **Prosecutorial Misconduct**

The Defendant asserts that the prosecutor engaged in misconduct by: (1) using Defendant's lyrics as evidence of criminal conduct which improperly prejudiced him; (2) refusing to permit independent drug testing of the seized pills; and (3) failing to disclose Brady evidence. (Doc. No. 417-1 at 9-11).

A. **Procedural Default**

A § 2255 motion is not a substitute for a direct appeal. See Bousley v. United States, 523 U.S. 614, 621-22 (1998); Sunal v. Large, 332 U.S. 174, 178-79 (1947). Claims of error that could have been raised on direct appeal, but were not, are procedurally barred unless the petitioner shows both cause for the default and actual prejudice or demonstrates that he is actually innocent of the offense. Bousley, 523 U.S. at 621-22; United States v. Bowman, 267 F. App'x 296, 299 (4th Cir. 2008). "[C]ause for a procedural default must turn on something external to the defense, such as the novelty of the claim or a denial of effective assistance of counsel." United States v. Mikalajunas, 186 F.3d 490, 493 (4th Cir. 1999).

To show actual prejudice, a petitioner must demonstrate that errors in the proceedings "worked to his actual and substantial disadvantage" and were of constitutional dimension. United States v. Frady, 456 U.S. 152, 170 (1982). To show actual innocence, a petitioner must demonstrate

16

Case 3:20-cr-00385-MEO-DCK    Document 433    Filed 01/16/26    Page 16 of 20

that he "has been incarcerated for a crime he did not commit." United States v. Jones, 758 F.3d 579, 584 (4th Cir. 2014). Actual innocence is based on factual innocence and "is not satisfied by a showing that a petitioner is legally, but not factually, innocent." Mikalajunas, 186 F.3d at 494.

The Defendant has procedurally defaulted his prosecutorial misconduct claims about independent drug testing and a Brady violation insofar as he did not raise them at trial and on direct appeal. The Defendant has not overcome his procedural default of these claims. That is, because his claims of ineffective assistance on these issues lack merit, he has not shown cause to overcome his procedural default. He has also failed to show prejudice, where he has not shown prosecutorial misconduct in the first instance and, therefore, that any alleged misconduct worked to his actual and substantial disadvantage. Nor has the Defendant shown actual, factual innocence of the charge. See Weeks v. Bowersox, 119 F.3d 1342, 1352-53 (8th Cir. 1997) (holding mere allegations that exculpatory evidence exists is insufficient to support a claim of actual innocence). The Defendant's claims regarding a Brady violation and independent drug testing, therefore, will be dismissed. All of the Defendant's claims of prosecutorial misconduct fail on the merits in any event.

### B. Merits

To establish prosecutorial misconduct, a defendant must demonstrate: (1) that the prosecutor's conduct was improper, and (2) that the improper conduct prejudicially affected his substantial rights so as to deprive him of a fair trial. United States v. Mitchell, 1 F.3d 235, 240 (4th Cir. 1993).

#### a. Music Lyrics

The Defendant contends that the prosecution violated his due process rights by using his "artistic expression as evidence of criminal conduct…," and that this "created an unacceptable risk that the jury would make its decisions based on improper prejudices and stereotypes rather than

17

actual evidence." (Doc. No. 417-1 at 9). The prosecution did not present the lyrics as evidence of criminal conduct, and such did not prejudice the Defendant for the reasons previously discussed. See Section 1(B), *supra*. This claim, is therefore, dismissed and denied.

### b. Independent Drug Testing

Under California v. Trombetta, "[w]hatever duty the Constitution imposes" to preserve evidence is "limited to evidence that might be expected to play a significant role in the suspect's defense." 467 U.S. 479, 488 (1984). Thus, "the evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." Id. at 489. The failure to preserve "'potentially useful evidence' does not violate due process 'unless a criminal defendant can show bad faith on the part of the police.'" Illinois v. Fisher, 540 U.S. 544, 547-48 (2004) (quoting Arizona v. Youngblood, 488 U.S. 51, 58 (1988)) (emphasis added). To establish bad faith, an officer must have "intentionally withheld the evidence for the purpose of depriving the [defendant] the use of that evidence during his criminal trial." United States v. Fridie, 442 F. App'x 839, 842 (4th Cir. 2011) (quoting Jean v. Collins, 221 F.3d 656, 663 (4th Cir. 2000)).

The Defendant contends that he "was never allowed to have his own expert independently test the pills to verify or challenge the government's conclusions," and that this deprived him of a meaningful opportunity to challenge the reliability of the drug sampling and testing methodology. (Doc. No. 417-1 at 9-10). This claim is conclusively refuted by the record insofar as the Government's chemist testified about the sampling methodology and testing results. (See JA 242-46). The Defendant's speculation that additional independent testing may have been favorable to the defense is too vague and conclusory to demonstrate prosecutorial misconduct. (See, e.g., Doc. No. 347 at 5 (acknowledging that there was no evidence that any of the chemically tested evidence

18

Case 3:20-cr-00385-MEO-DCK     Document 433     Filed 01/16/26     Page 18 of 20

turned out not to be a controlled substance)]; Fisher, 540 U.S. at 547-48; Fridie, 442 F. App'x at 842. This claim is, therefore, dismissed and denied.

### c. Brady Violation

In Brady, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. "Therefore, a Brady violation contains three elements: the evidence was (1) favorable to the accused, (2) suppressed by the government, and (3) material to the verdict at trial." Nicolas v. Attorney Gen. of Md., 820 F.3d 124, 129 (4th Cir. 2016). Evidence is "material" if there is a "reasonable probability that [its] disclosure would have produced a different outcome." United States v. Stokes, 261 F.3d 496, 502 (4th Cir. 2001) (citation omitted). "Both information that undermines the prosecution's case and information that supports the defendant's case constitute Brady material that must be disclosed." Nicolas, 820 F.3d at 129.

The Defendant contends that the prosecution violated Brady by "failing to disclose material evidence related to the pills' testing," i.e.:

- Complete laboratory protocols and procedures used in testing the pills;
- Quality control and calibration records for testing equipment;
- Notes and bench sheets from the forensic chemist;
- Any negative or inconsistent test results; and
- Chain of custody documentation for the samples.

(Doc. No. 417-1 at 10). He contends this information is material because "it could have been used to challenge the reliability of the government's testing and sampling methodology." (Id. at 11).

This claim is conclusively refuted by the record insofar as an exhaustive controlled

19

substance analysis report was provided to the defense during discovery, and the chemist's testimony adequately established the drug weight at trial. (See Doc. No. 428-1: Controlled Substance Analysis Report; JA 242-46). The Defendant has failed to support his present allegations with any evidence. His speculation that the foregoing information would have been favorable and could have been used to challenge the Government's testing and sampling methodology is too vague and conclusory to demonstrate that a Brady violation occurred. This claim is, therefore, dismissed and denied.

### IV. CONCLUSION

For the foregoing reasons, Defendant's § 2255 Motion to Vacate is dismissed and denied.

**IT IS, THEREFORE, ORDERED** that:

1. The Defendant's Motion to Vacate, Set Aside or Correct Sentence under 28 U.S.C. § 2255 (Doc. No. 417) is **DISMISSED AND DENIED**.

2. **IT IS FURTHER ORDERED** that pursuant to Rule 11(a) of the Rules Governing Section 2254 and Section 2255 Cases, this Court declines to issue a certificate of appealability. See 28 U.S.C. § 2253(c)(2); Miller-El v. Cockrell, 537 U.S. 322, 338 (2003) (in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong); Slack v. McDaniel, 529 U.S. 473, 484 (2000) (when relief is denied on procedural grounds, a petitioner must establish both that the dispositive procedural ruling is debatable and that the petition states a debatable claim of the denial of a constitutional right).

**IT IS SO ORDERED**.

Signed: January 16, 2026

Matthew E. Orso
United States District Judge